that we've consolidated for purposes of oral argument, and that's Crossroads Systems v. Oracle Corporation. And let me make sure that I have the order of the arguments correct. Mr. Draxeth, you're going to speak first, and you're going to go for eight minutes, reserving four for rebuttal. Mr. Courtney, you're going to argue for eight minutes. And for the appellant, Napoli, respondent, cross-appellant, we have Mr. Emke going for 14 minutes. Is that correct? That's correct, Your Honor. And then Mr. Bobrow for six. That's correct, Your Honor. Okay. You may proceed. May it please the Court, Your Honors, today we intend to split our time with me talking about the mapping between issues, mainly the issues in the Cisco appeal, but also some what in the Oracle appeal. And then Mr. Courtney will handle the... And this issue cuts across both of the cases, right? The mapping between it cuts across both, right. And then Mr. Courtney will talk about the CACUCI and the access control issue. But we'll also respond to whatever questions you might ask, just trying to give a preamble. This is an odd appeal, especially with regards to the mapping between, because the petitioners argue below, and they argue on appeal, that mapping to a device out on the network is the same as mapping to a port inside your box. But the board didn't hold that. The board backed up and they said, well, they're almost the same. They said they're tantamount to that their effect is the same. But they didn't say that they're the same. And so we have a situation here where there's a disconnect between what the board did and what the parties below argued. Now, the problem with the board's central reasoning is that's not the law. OK, tantamount to is not one limitation, tantamount to another limitation. The claim construction says representation of devices on either side of the storage router, right? For the term map to, yes. For the mapping limitation. OK, so as I understood the board's reasoning, they concluded, it concluded that the channel numbers in the CRD manual are a representation of each of the host devices because each channel, each channel number is assigned to a single host device, as shown in figure 1-2 of the CRD manual. I think you have that right. So what's wrong with that? So I think what you have to do, really, to understand what went wrong here is look at the claims in their completeness to figure out where this map has to be. I guess going back to the CRD manual, is there, wouldn't you say there's some kind of mapping going on there in the sense that for each host device, it gets, there's a connection between or through that controller to a redundancy group on the other side of the router. And so therefore, that host device can access data from some remote storage device in the redundancy group through the controller. There's a map to the channel, and there's a connection. There's not a map to the device. Now, the device, there isn't a broken link between the channel and the host computer, right? The host computer is able to reach out and grab data from some remote storage device on the other side of the CRD manual's controller. Whatever that device might be. Yeah. But it doesn't know what that device is. Now, you ask me, where is this in the claim? It's where you should go next. If you look at claim 21, which is on page 8 of the blue brief, the claim lays out each of the following things. There's a first controller, a second controller. Those are the cards that go into the box. The network interface cards, really. There's a storage device at the end of a medium. Another storage device at the end of a medium. We're not to the map yet. And then there's the access control device. This is the central brain of the box. And if you look at figure 4, we show that. But it's the thing that does the routing. And that's where the mapping has to occur. The map can't be in the whole... You can't back up and say, well, when I look at the whole system, I see a connection. So there's a map in this system from one end to the other. The claim requires that the map be in the central brain of the device. So let's zoom in on the CRD5500 brain. And all that's there in that one table is the channel. There is no device there. The only way they can get the device in is by zooming out from this access control device, what they've read it on in the CRD, and looking at the rest of the system. And that's the fundamental difference. All of these claims require the map to be in the brain of the device, not out in the way that the system is connected. And you see it in the specification, top to bottom. That's the only reason that we are able... Because we can see outside the box, we can have the multiple computers connected. What about the 147 patent's disclosure of the arbitrated loop physical address? As I understand it, that's a port identifier. A port, the device's port, the storage device's port, not the router's port. So I guess what I see in that discussion in the spec is not necessarily an address for the device itself per se. I see an address for this port. It's a port on the device, so it is an address. But the address is constantly changing. Sure, so I'll take those two points. Because one of them relates to their immutability argument. One, I think, relates to their intermediate addressing. Let's use something a little bit more modern. A laptop computer that has a network card inside. That has a port, whether it's a wireless port, I guess, or a plug-in port. That is in the device. That is an address of the chip that does the networking in your computer. Just like in our patent when we talk about the port for this device, the fiber channel port. That is the device. It's a port on the device. It's not something in between. It's the device itself. So our patent isn't describing that you're talking to something that isn't the device. You are specifying the address for that device. So that's the intermediate. Okay, so just so I understand, the ALPA is part of some fiber channel arbitrated loop, right? The ALPA is assigned to the card at the device that's connected to the loop. They call the whole thing a port. The loop is just a wire spliced together. The brains are on the interface card. You see it in the patent for the cards that are in the box. They are a port. They're the channel. And the chip is on that card for connecting to the fiber channel. And then on the loop for each of the computers. So there's a loop. There's a card. And then there's the device.  So the card is part of the device. This card is not just floating around somewhere. It's a card that is, you think if you open up your desktop computer, we used to, you know, now it's all soldered right into the motherboard. But you put a network card into your computer. That is the device. I think we're splitting hairs a little bit about is the card that's plugged into the device the device. Even if it's not. Even if you said, well, the computer isn't the stuff that's inside the computer for some reason. That doesn't get you all the way to saying, well, the card that's in a completely different place, inside the router, counts. Which is what the board did. The board said, well, we're going to decide that this card in the computer isn't exactly the computer. So any card can count under these claims. And that's not the case. What is happening with that fiber channel card that's out at the device is that's unique to that one device. It's in the device. It is the device. It doesn't, it can't be switched. I mean, you can pull the computer apart to take it. But it doesn't change in the way that pulling a cable out of the router does. You're able to see out, and that address is the address for that device. It's not the address for the wire. It's not the address for the channel. It's the address for that device. Now, you mentioned the immutability point, the fact that these addresses, the numbers could change. You reboot the loop. It's still, and their assertion is that we said that can't be, that the system has to be immutable. We never said that. The number can change. You're into your rebuttal time. You can continue or stop here. I'll just quickly say it can change, but it's still the number for the device. So if you boot it up, that device may get a different number, but it's still the number for that device and not for a port that's on the router. We'll restore your four minutes rebuttal time. Yeah. Your Honors, I'll speak about the diligence issues that are in the 1930 appeal. This is only an issue in the Oracle appeal. We think the Board committed a significant legal error here in applying the wrong diligence standard. There are two aspects to the error that we see here. The Board's diligence analysis was highly, highly restrictive, highly, highly formalized, and excessively focused on a single limitation of what's actually a much larger claim. As Mr. Dragset described, Crossroads claims describe system or device, some claims are methods, but it has numerous parts. There are controllers, there are devices, storage, a router at the center. Aren't there a standard to review on this particular issue is whether the decision is supported by substantial evidence, correct? Not as to legal issues, Your Honor. We would submit that the Board's error here was in the nature of the legal standard. On the factual findings, it's substantial evidence? To the extent that the Board applied the correct legal standard, it would be a substantial evidence review. Okay. Again, we think that the error here was legal in nature with hyper-restrictive review. We would point in our brief to describe the Barbicid case, which rejects the Board's restrictive approach. The Board said if you're not working on access control, this one part of the larger claim, then none of that work counts per se. Even if you're correct with respect to this Interval 1, what about Interval 2, where the so-called Verrazano Project had already been completed? What about Interval 2? The Board introduced this taxonomy of Interval 1 and Interval 2. I think these are not actually intervals. I think that's how the Board divided its analysis of technical diligence from its analysis of prosecution diligence. That Interval 2 was focused on prosecution. We would submit that technical activities were continuing throughout both Interval 1 and Interval 2 through the entire critical period, right up until the filing of the application that gave rise to the patents. Did any of that activity include work on the features of the patent? Absolutely, Your Honor. I think our brief lays out there was work going on on setting up these controllers to interact properly with the router. There was work setting up storage devices, making sure the storage device communicated via the controller with the router. There was work on the network devices, making sure they communicated via the controller with the router. These are low-level functions. These are core to the aspect of any network system. Without them, the device doesn't work. The Board took this approach and said none of that counts because you weren't working on access control. But we couldn't reduce the invention to actual practice unless we designed a system that could perform the functions set out in the non-access control limitations. And we think Barbasid, we also cite the Koyama and Monsanto cases, highlights the error here. We sent in a letter late last week on Perfect Surgical Technologies case. We think that is highly illustrative here. And Perfect Surgical, this court, cast a very critical eye on hyper-restrictive diligence analysis. It criticized the Board for being overly restrictive and applying a highly formalistic approach. And we think that's instructive here. We think Perfect Surgical and the other cases we cite make pretty clear that the Board's diligence analysis— Are you referring to the Jolly case right now? I was specifically referring to Perfect Surgical, but I'm happy to discuss Jolly as well. We also cited Jolly. That's a case in which this court affirmed a diligence finding where the core diligence activity, again, was on a project that did not practice the count. The inventors there were working on it. It was a lubricant. They had a two-compound lubricant. Had they made it to a three-compound lubricant, they would have practiced the count. But they were only at two. And this court affirmed the Board's holding that, well, you work on two and then you get to three. There's a showing here that you're on your way. And we think that's what the evidence here showed. The Crossroads inventors were working on the claimed storage router. They had begun getting the networking working, hardware, software integration. I think that's not materially disputed. Can you speak to the finding by the Board that the control access part of the claimed invention here was left to the side during the work on the Verrazano project? We would dispute that it was left to the side, Your Honor. I think the record here shows that, as is common in electrical engineering, there was a roadmap for this product. The product was going to begin by getting the foundational features working. And then we would work our way up the stack. Once things were communicating properly, once the fiber channel was working, the controllers were working, the devices, all that are working, then at that point, the access control can be layered in. So it's a continuous path that leads all the way from there's some preconception activity. But didn't the Board make a finding that it found that the inventors could have chosen to work on the control access feature but chose not to? Why? Because it needed to work on the Verrazano project for finance reasons. And so, therefore, it left the control access feature to the side. I mean, that's a finding made by the Board. So now I'm trying to figure out why is that an unreasonable finding to make. So I would submit there's a mixture there of a factual finding and a legal conclusion. Certainly there was testimony in the record that Crossroads had decided that access control would come at a later phase of the project's development. We're not disputing that. That's a fact that no one disputes. What the legal consequence of that is, I think, is where the Board went wrong. The Board said, ah, you set it aside. You decided to work on it later. That means you were ipso facto non-diligent, reducing your claim to practice. And we said we would submit that under Jolly, Barbicid, Perfect Surgical, that's an incorrect application of the facts to the law. Under the law, we would say those cases permit an inventor, even if he takes a winding path to reduction to practice, the inventor can choose the path he will, so long as he is at all times reasonably engaged in the project that will bring the invention into actual practice. Here, of course, constructive reduction to practice kind of interrupted the flow. But they were, in fact, on the path. And there's testimony in the record that they later did actually reduce as well. Crossroads brought access control into Verrazano. You say reasonably engaged. If there's no finding that there was work being conducted on the access control feature, then is that reasonably engaged? We would tender that the undisputed record of us working on non-access control features establishes that we were reasonably engaged in bringing the entire invention to reduction to practice. We were not disputing that access control on the record here had been put in the timeline to come after the foundational networking was done. I only have a little bit of time left, so I want to make sure that I talk a little bit about the nature of the challenge below. Before the board, Oracle's attack on this evidence was the legal attack, work on non-access control limitations doesn't count. They did not attack the quantum of our diligence evidence. So we would say that if the board finds legal error here and finds that work on the non-access control, I'm sorry, the court finds legal error and finds that work on the non-access control limitations counted, that's grounds for reversal. Was the Verzano project conceived of before this claimed invention was conceived of? That's correct, and we think that's common in these areas, that a team begins work on a product and then as they're going along, one or more members of the team come to some conception moment where they imagine a future product that resembles the product they're already working on but has new capabilities that weren't originally conceived, and that's the story here. So there's got to be a beginning and an end to this process, correct? That's correct. So for the invention that Crossroads claimed, the date of conception I think is not in dispute. There's an invention disclosure that sets it out, and the story ends with constructive reduction of practice at the filing date. I do want to talk briefly, I know we have very little time left, about the Cacucci reference. We think even if this court sanctions the legal approach that the board took, we think the findings as to Cacucci are not supported by substantial evidence. Cacucci uses an offsetting technique that lacks the granularity necessary for real access control. And finally, although I'm intruding on Mr. Drax's domain here a little bit, Mr. Drax has spent a while talking to the court about how the maps between limitation requires that there be in the brain an identification of the device, and the independent claims really highlight that. The dependent claims that are cited in our briefing describe a worldwide name, very clearly a name of a device. They describe a host device ID, a name of a device. There's no room for tantum out here. There's no room for, well, it's almost the same. These are very specific limitations, and I think you'll find that the record here from our counterparts doesn't develop those dependent claims to the standard necessary to sustain the board's approach. Okay, thank you. Mr. Amke. Thank you, Your Honors. May it please the court. Crossroads' appeal fails. They have not challenged the fact findings by the board that are dispositive of the issues in this case. Crossroads did not challenge the fact findings about the fiber channel teachings of the Hewlett Packard Journal. Crossroads did not challenge the board's finding that combined those teachings with the mapping features in the CRD manual. The board applied those findings throughout the final written decision, and in particular… Is this your argument that the so-called mapping limitation, in your view, the board found was disclosed by both the CRD manual and the HP Journal? Just to clarify, yes. The board determined that the CRD manual disclosed the mapping limitation using the channel number IDs, as you were discussing earlier. The board also, in response to Crossroads' arguments about the reported shortcomings of the CRD manual channel numbers, also identified that the CRD in combination with the teachings of the Hewlett Packard Journal render obvious the mapping limitation. So it's both the board found. Was that second finding that you believe the board made the finding on, was that a theory you raised in your petition? What was raised in the petition, Your Honor, the ground has always been the CRD manual in view of the teachings of the Hewlett Packard Journal. Right, but you know what I'm talking about. I do, I do. And this was a highly contested issue at the oral argument below. And the board actually addressed these issues with respect to the teachings of the Hewlett Packard Journal, addressed Crossroads' arguments with respect to the Hewlett Packard Journal in their final written decisions. Crossroads argued about these teachings, argued about the Hewlett Packard Journal. This wasn't a new thing that was sprung upon them. It was developed during the record. They had an opportunity to argue about it. The board addressed it at the oral argument. The board addressed it in the final decision and reached the conclusion that the CRD manual in view of the Hewlett Packard Journal also renders the mapping limitation obvious. But where in the petition would I find this argument? The petition set forth was the use of the CRD mapping, using unique identifiers to channel number IDs. And it walked through that. The petition set forth that you would use the teachings of the fiber channel aspects of the Hewlett Packard Journal to take a multiple series of devices and collapse those devices together onto a single fiber channel loop. All that was set forth in the petition. Okay, so then what you're telling me is if the board did make a second fact finding about the mapping limitation, then that second fact finding did not rest on a theory that was raised in the petition. I would disagree, Your Honor. The theory in the petition has always been using the mapping of the CRD plus the fiber channel teachings of the Hewlett Packard Journal. That was set forth in the petition. Now, to the extent that additional arguments were raised throughout the proceeding with respect to some of the technical implementation or other bodily incorporation, additional evidence was developed during the trial. In many decisions with respect to the proceedings, the board is not limited to solely the facts that are set forth. Could you just cite me the petition page that's the most relevant so that I can look at it? Absolutely, Your Honor. The page that would be most relevant is going to be appendix 158 to 163, discussing at length the teachings of the Hewlett Packard Journal, in particular, the increased addressability. The reason to combine the increased addressability and the use of combining multiple devices onto a single loop. Is there a particular quote you want to show me? I believe it will be at the top. Go to the bottom of page 159 through 160, Your Honor. The Hewlett Packard Journal is teaching that the fiber channel serial transport medium provides solutions to the limitations because it provides bandwidth, it provides increased addressability and simplified cabling. Again, so we're bringing them all together. We're also then continuing on that one of the things that you want to do is you want to replace a sequence of five SCSI ports and combine them together into a single fiber channel port. We're solving the slots and watts problem. We continue on on page 161 that it would be combinable and predictable to put them together because it was designed to support the fiber channel. It contemplates on the middle of 161, Your Honor. The Hewlett Packard Journal contemplates replacing the multiple ports with a single port and that they're intended to encapsulate the SCSI commands. And there's more as well. The theory has always been, with respect to this, of you have the teachings of the CRD manual which teaches mapping to particular hosts. That's the quote from the CRD manual. Mapping to a particular host. Now the way it did it is it used a unique identifier called the channel number ID which was the address for those individual computers. You have that baseline teaching. Now what we want to do is we just want to bring those multiple devices together. They're all on separate SCSI channels onto a single port with respect to the fiber channel. I'd also like to address a few of the arguments made by Crossworth earlier with respect to the CRD manual. I want to focus on the map in the brain of the box issue. I think that actually highlights the distinction with respect to the representation. Because the map is in the box, in the center box, it has to use representation just like they were saying. It's not a map that's expansive outside the whole scope of the system. It's a map within the box. And so you have the computers and you have the storage on the other side. But we can't take the host device over here and stuff it into the box. The device itself is in the box. We're talking about computers. We're talking about using representations. We're talking about using numbers that are used to communicate and create the path. Your questions earlier, Your Honor, about the arbitrary loop and the cards are precisely on point. We have the fiber channel addressing using the ALPA. We have to go across a wire. We have to go to a card. The ALPA is the address that's currently associated with a card. That card is currently associated with a computer. The ALPA is an address in the same way that the channel number is an address with respect to the channel. The notion of the device itself, particularly... I guess Mr. Dragset is saying the channel is a separate unit from the device, host device itself, whereas the card in the ALPA is part of the device. The cable that's connecting to the computer is part of the device in the same way that the card is part of the device. We seem to be arguing then in that scenario about the length of the connection. It certainly doesn't seem to be an issue with respect to the claims. You have a channel associated with the computer and you have a card associated with the computer. You have a channel number associated with the channel. You have an ALPA address associated with the card. Use the channel number to create a path to the computer. Use an ALPA number to create a path to the computer. There's really no distinction in that scenario except the length of the cable, which, again, is not an issue here. The remaining issue that I wanted to touch on, Your Honor, is, again, the device-to-device concept raised repeatedly. The claims aren't requiring to the device. All the examples in the specification, whether it's the SCSI ID, the ALPA, or port identifiers, are all talking about things that are not the device itself. They're all intermediary devices. The Board addressed that in its claim construction. Addressed it specifically, finding that mapping to the device itself is not a requirement of the claims. The claims are not so limited as to be only mapping to the devices themselves. I think the Board's construction was correct. I think the Board's fact findings are well supported. So you say that the Board's construction was correct. Does it really matter? I mean, even if we go under either Crossroads construction or the Board's, as far as the CRD reference is concerned, is the Board still correct? I think the Board is correct, absolutely. Under either construction? Even if we accept Crossroads interpretation? Yes, Your Honor. Is the result the same? Correct, because Crossroads has acknowledged that the ALPA identifier meets and satisfies the mapping limitation, even under their narrowed construction. So the findings by the Board with respect to the ALPA, absolutely. Even under their narrowed interpretation, rendering the mapping limitation obvious. Absolutely. Thank you. The last point I'd like to address is just the purportedly narrow dependent claims. Again, with respect to the ALPA findings, unique identifiers were determined to be found within the prior art, identifiers of host devices. There's not a lot of distinction going on here with respect to the unique identifiers, worldwide name, or host identifiers. Because, again, the ALPA is satisfying that the ALPA is unique. The ALPA is identifying the host, and the Board determined that the ALPA meets these limitations as well. What about the host device ID argument? Yes, Your Honor. With respect to the host device ID, what's interesting about that one in particular is this dependent claim is based on an independent claim, actually all of them, where there's only claimed a single host. There's not a requirement of a plurality of hosts. So all the arguments there about the need to differentiate and distinguish, and that's why you would need to have a host device ID, just simply don't exist in these particular claims. There's only a single device, which is exactly what the CRD is disclosing, is a single device, and it's using an identifier that identifies that device. Any other questions? Thank you, Your Honor. Thank you very much. Barbara. Thank you, Your Honors. Good morning. May it please the Court. Let me begin with the diligence issue as it relates to the Board's finding that there was a failure of diligence in terms of reduction to practice. There certainly was more than substantial evidence in the record that what happened here was that Crossroads set aside its efforts to reduce the invention to practice. It set that aside and decided instead to work on commercializing a commercial product rather than... That's the Verrazano project? Is that the Verrazano? Yes. They're arguing that in working on the Verrazano project, in fact, what they were doing is also reducing to practice the different claims. And that's not what the Board found, and the Board's finding is based on substantial evidence, and here's why. What Crossroads overlooks, and doesn't even mention in its reply brief, is that there were working prototypes of the bridge product. There were working prototypes during the critical period. Those prototypes, the Board found and the evidence shows, were running software. They were working and being tested even before, actually, this critical period from August to December. The testimony below was that the access controls was the only missing piece. That's all that was left to do. If access controls were run on this Verrazano bridge, you'd have a reduction to practice. The problem with Crossroads' argument is that it ignores that this work could have been done, and a reduction to practice could have been achieved in that critical period had only Crossroads tested the access control software on the operating prototype hardware. And they failed to do that, and they chose not to do that because they wanted to work on putting together a commercial embodiment of something that did not embody the invention because it didn't have access controls. In our view, this case is spot on with the neighbor versus creaky case from the CCPA back in 1977. We discussed that in our brief, and it's essentially on all fours. What happened there was there was a count, that count related to a semiconductor device. The testimony below was that the inventor could have built a laboratory scale version of the semiconductor ship, but chose not to do so. That was available to do, but chose not to. And what they did instead was they worked on things that would help in the future make the device more useful, more commercially useful. And the CCPA actually reversed the board's finding. There was diligence and said there's no diligence here. You could have reduced the invention to practice. You didn't. You made an election not to, and so diligence fails. Let me pick up, though, also on the question that Judge Lynn had asked earlier in the proceedings today, which is that there was an utter failure here to show diligence in November and December of 1997. Below, Crossroads argued that its diligence could be shown by work on the patent application. That was the entirety of the evidence they brought forward to the board. They prepared a chronology, and they purported to show in the chronology how the work that they were doing showed diligence. Mr. Courtney, I think, argued that there was actually some technical work that was also done. They argue that now. They did not argue that below. And there's no evidence that has been built out that there was any technical work going on. None. There are random pieces of notebooks that nobody has ever explained. And below, nobody said, this page of this notebook shows X. Those notebooks were introduced into the record, correct? They are introduced in the record. But significantly, what Crossroads told the board about those was when it was trying to put forward its diligence argument, number one, it didn't identify any passages of those notebooks. None in the chronology that it prepared. And when it prepared the chronology, what it told the board, and this is in appendix 6645 to 46, what it told the board was that the chronology was detailing with Arizona development milestones from the date of conception to the constructive reduction to practice as shown in the foregoing exhibits.  And yet, they did not cite a single page from those notebooks from the period of October 19th through December 31st. So we have not only the setting aside of the invention. They clearly were not working on reduction to practice when they could have. But number two, what they argued to the board below, they have completely abandoned that on the appeal, that their prosecution activities in any way show diligence. Let me now, if I may, address the argument that was made about Kikuchi and access controls very briefly on that. There is an unchallenged claim construction here that access controls, what that means is controls that, quote, limit a host computer's access to a specific subset of storage devices or sections of a single storage device according to a map. Crossroads concedes that the Kikuchi reference shows the first type of access control where there are limits on a host computer's access to a storage device. There's no dispute. That's the end of it. There's substantial evidence that there are access controls. Finally, if I may, on the issue of the combination in the Oracle NetApp proceeding, the CRD and Smith combination, the board found that there were two ways, two separate ways in which hosts were identified, representations of hosts, and that hosts were identified in that combination. One way has already been discussed, the channel ID of the CRD. The second is essentially the fiber channel unique identifier, which was raised in our petition, which was set forth in Professor Chase's declaration. All of that laid out that there was a separate way in which hosts could be represented by a fiber channel unique identifier, which would be in a fiber channel packet. That identifies a device and more than satisfies, for example, the dependent claim host device ID limitation. Thank you, Your Honors. Mr. Dragseth, we'll restore before four minutes. Let's start with a couple of points on the diligence. I think the best way to coalesce the law in this area is to ask, were the inventors following a path to get from the base to something else, or did they go off in other directions? Here they are following a path. They developed a base switch, the basic device. Yeah, they went and sold it, and then they added on the extra functionality afterward. That's part of one path. That distinguishes cases like Crickey, where he had the ability to take his path and make the basic transistor, and he didn't take that path. He went on a completely different path. It was not a single path, and that's what the board got wrong here, and I think it's the way for this court to best understand all of the cases that have been cited. One point, counsel said that there was evidence, support for evidence, that we had working prototypes. That's not what the record says. At A29164, there's a reference to prototypes, and there was testing occurring. So the concept that, yeah, we had it done, had the base thing done, and then just kind of waited around and did commercial activity, and then later picked up the addition of the routing is wrong. At least the evidence does not support that. It just says there were prototypes. It doesn't support this suggestion that they were finished, and then we paused. I think, Judge Lynn, you picked up on we do not have the burden of persuasion on this point. They bear the burden throughout to invalidate the patent. We produced the evidence, and we did point to various pieces of the evidence. The key thing is the board didn't look at the quantum anyway, and so you can't affirm them on the quantum. They looked at the fact that they didn't think we were working on the relevant points. So whatever the evidence is, the board used the wrong legal analysis. On waiver, and really on a lot of the points for independent claims, here's what the panel really needs to understand. Can we just go back to diligence?  Do you think, as a matter of law, if there are overlapping elements with two inventions, that working on the shared limitations is always going to be diligence for the other invention? No, and that's why I focused you on the path. So if you have things that just happen to be common down here, but one goes in that way, the invention goes in that way, and the work went in that way, you don't get all of this, the benefit of all this work that went the other direction. But here the work was on cards that go into the box, and the basic functionality of having a box that can move data, and then we added this cool extra feature of, well let's control at the central brain how that data is moved. So that feeds the central brain again, and why we're focusing on the central brain is there's a fundamental problem on the dependent claims and on all the mapping limitations. These claims require that the map be in the central brain of the device. That's relevant for the independent claims, but it's centrally relevant for the dependent claims, because you don't see in their brief, and you don't hear anything that they said today, about how those IDs, the FC addresses, are in the map. And that's what the claims require. They said, well the prior art system, when we make the combination, there's FC addresses out there somewhere. But never, you can go up and down through their briefs, you can go up and down through the record, you can go up and down through the hospital declaration, which we never heard about today, and that's the only evidence that Cisco has. Never do they say that those IDs are in the map. Can you go to the waiver? Sure. There's a lot to it. We spoke a lot about it in our brief. I think some relevant points. Number one, what they didn't talk about today, hospital. That's their evidence. It's not in their brief, they didn't talk about it today. They talked about their petition. The pages they found in their petition, they found eight pages in their petition. You know what two pages weren't there? The two pages that the board cited, when the board introduced this place, where the board supposedly found the alternate environment. Now what did the board actually do, in this paragraph that we're fighting over? If you look at it, there's three clauses in that sentence, and the board says, basically, you're going to use the map from the CRD 5500, and then you're going to swap in these cards, and they'll communicate with their loops using the fiber channel IDs. There's nothing about the fiber channel IDs going into the map, and that's critical for the waiver, and it's critical for all the other issues here, because the key is to get there, especially for the dependent claims, they have to get those fiber channel IDs into the map, and our claims say that the map's not out on the network, the map's not on the expansion cards. The map is in, in some claims we call the supervisor unit, in other claims it's the access control unit, I think. But that is separate from those cards, and separate from the network. Those unique identifiers have to get into the map, and never did they say that they get into the map. That is what's the critical problem with their alternative theory. I think it's the problem they saw in the approach the board took, because the board didn't make that jump, and there's just no record to make that jump, especially with Mr. Hospitor, who never even said anything about the HP journal with respect to that. We thank you very much.